642 A.2d 1372

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. MARGARET KELLY MICHAELS,
DEFENDANT–RESPONDENT.

Argued January 31, 1994—Decided June 23, 1994.

*John S. Redden,* Deputy First Assistant Prosecutor, argued the cause for appellant (*Clifford J. Minor,* Essex County Prosecutor, attorney; *Mr. Redden, Debra G. Lynch,* and *Elizabeth A. Duelly,* Assistant Prosecutors, of counsel and on the brief).

*Daniel R. Williams,* a member of the New York bar, argued the cause for respondent (*Alan L. Zegas,* attorney; *Robert Rosenthal* and *Daniel V. Finneran,* a member of the New York bar, of counsel).

*Catherine A. Foddai,* Deputy Attorney General, argued the cause for *amicus curiae* Attorney General of New Jersey (*Deborah T. Poritz,* Attorney General of New Jersey, attorney).

*Amy Gershenfeld–Donnella* submitted a brief on behalf of *amicus curiae* Developmental, Social, and Psychological Researchers, Social Scientists and Scholars.

*Simon Louis Rosenbach,* Assistant Middlesex County Prosecutor, submitted a brief on behalf of *amicus curiae* County Prosecutors' Association of New Jersey (*Jeffrey S. Blitz,* President, Atlantic County Prosecutor, attorney).

The opinion of the Court was delivered by

HANDLER, J.

In this case a nursery school teacher was convicted of bizarre acts of sexual abuse against many of the children who had been entrusted to her care. She was sentenced to a long prison term with a substantial period of parole ineligibility. The Appellate Division reversed the conviction and remanded the case for retrial. 264 *N.J.Super.* 579, 625 *A.*2d 489 (1993).

The Appellate Division based its reversal on several major errors that occurred in the prosecution of the case. Only one of those errors is the subject of this appeal. In setting aside the conviction, the Appellate Division ordered that if the State decided to retry the case, a pretrial hearing would be necessary to determine whether the statements and testimony of the child-sex-abuse victims must be excluded because improper questioning by State investigators had irremediably compromised the reliability of that testimonial evidence.

The State filed a petition for certification seeking review of all the Appellate Division's adverse rulings. This Court denied the petition with respect to all issues except for one concerning the necessity for a pretrial hearing to assess the reliability of anticipated trial testimony because of the improper interrogations. On that issue, this Court denied the petition without prejudice, allowing the State to file a motion for reconsideration of its petition limited to that issue in the event it decided to retry the case. Having determined that it will retry the case, the State filed a motion for reconsideration of its petition for certification, limited to the pretrial hearing issue. The Court granted the motion for reconsideration and the limited petition for certification. 134 *N.J.* 482, 634 *A.*2d 528 (1993).

I

In September 1984, Margaret Kelly Michaels was hired by Wee Care Day Nursery ("Wee Care") as a teacher's aide for preschoolers. Located in St. George's Episcopal Church, in Maplewood,

Wee Care served approximately fifty families, with an enrollment of about sixty children, ages three to five.

Michaels, a college senior from Pittsburgh, Pennsylvania, came to New Jersey to pursue an acting career. She responded to an advertisement and was hired by Wee Care, initially as a teacher's aide for preschoolers, then, at the beginning of October, as a teacher. Michaels had no prior experience as a teacher at any level.

Wee Care had staff consisting of eight teachers, numerous aides, and two administrators. The nursery classes for the three-year-old children were housed in the basement, and the kindergarten class was located on the third floor. During nap time, Michaels, under the supervision of the head teacher and the director, was responsible for about twelve children in one of the basement classrooms. The classroom assigned to Michaels was separated from an adjacent occupied classroom by a vinyl curtain.

During the seven month period that Michaels worked at Wee Care, she apparently performed satisfactorily. Wee Care never received a complaint about her from staff, children, or parents. According to the State, however, between October 8, 1984, and the date of Michaels's resignation on April 26, 1985, parents and teachers began observing behavioral changes in the children.

On April 26, 1985, the mother of M.P., a four-year old in Michaels's nap class, noticed while awakening him for school, that he was covered with spots. She took the child to his pediatrician and had him examined. During the examination, a pediatric nurse took M.P.'s temperature rectally. In the presence of the nurse and his mother, M.P. stated, "this is what my teacher does to me at nap time at school." M.P. indicated to the nurse that his teacher, Kelly (the name by which Michaels was known to the children), was the one who took his temperature. M.P. added that Kelly undressed him and took his temperature daily. On further questioning by his mother, M.P. said that Kelly did the same thing to S.R.

The pediatrician, Dr. Delfino, then examined M.P. He informed Mrs. P. that the spots were caused by a rash. Mrs. P. did not tell Dr. Delfino about M.P.'s remarks; consequently, he did not examine M.P.'s rectum. In response to further questioning from his mother after they had returned home, M.P., while rubbing his genitals, stated that "[Kelly] uses the white jean stuff." Although M.P. was unable to tell his mother what the "white jean stuff" was, investigators later found vaseline in Wee Care's bathroom and white cream in the first-aid kit. During the same conversation, M.P. indicated that Kelly had "hurt" two of his classmates, S.R. and E.N.

M.P.'s mother contacted the New Jersey Division of Youth and Family Services ("DYFS") and Ms. Spector, Director of Wee Care, to inform them of her son's disclosures. On May 1, 1985, the Essex County Prosecutor's office received information from DYFS about the alleged sexual abuse at Wee Care. The Prosecutor's office assumed investigation of the complaint.

The Prosecutor's office interviewed several Wee Care children and their parents, concluding their initial investigation on May 8, 1985. During that period of investigation, Michaels submitted to approximately nine hours of questioning. Additionally, Michaels consented to taking a lie detector test, which she passed. Extensive additional interviews and examinations of the Wee Care children by the prosecutor's office and DYFS then followed.

Michaels was charged on June 6, 1985, in a three count indictment involving the alleged sexual abuse of three Wee Care boys. After further investigation, a second indictment was returned July 30, 1985, containing 174 counts of various charges involving twenty Wee Care boys and girls. An additional indictment of fifty-five counts was filed November 21, 1985, involving fifteen Wee Care children. Prior to trial the prosecution dismissed seventy-two counts, proceeding to trial on the remaining 163 counts.

After several pretrial hearings, the trial commenced on June 22, 1987. The bulk of the State's evidence consisted of the testimony of the children. That testimony referred extensively to the pre-

trial statements that had been elicited from the children during the course of the State's investigations. The State introduced limited physical evidence to support the contention that the Wee Care children had been molested.

By the time the trial concluded nine months later, another thirty-two counts had been dismissed, leaving 131 counts. On April 15, 1988, after twelve days of deliberation, the jury returned guilty verdicts on 115 counts, including aggravated sexual assault (thirty-eight counts), sexual assault (thirty-one counts), endangering the welfare of children (forty-four counts), and terroristic threats (two counts). The trial court sentenced Michaels to an aggregate term of forty-seven years imprisonment with fourteen years of parole ineligibility.

## II

The focus of this case is on the manner in which the State conducted its investigatory interviews of the children. In particular, the Court is asked to consider whether the interview techniques employed by the state could have undermined the reliability of the children's statements and subsequent testimony, to the point that a hearing should be held to determine whether either form of evidence should be admitted at re-trial.

The question of whether the interviews of the child victims of alleged sexual-abuse were unduly suggestive and coercive requires a highly nuanced inquiry into the totality of circumstances surrounding those interviews. Like confessions and identification, the inculpatory capacity of statements indicating the occurrence of sexual abuse and the anticipated testimony about those occurrences requires that special care be taken to ensure their reliability.

The Appellate Division carefully examined the record concerning the investigatory interviews. It concluded that the interrogations that had been conducted were highly improper. 264 *N.J.Super.* at 629, 625 *A.*2d 489. The court determined from the record that the children's accusations were founded "upon unreliable perceptions, or memory caused by improper investigative proce-

dures," and that testimony reflecting those accusations could lead to an unfair trial. *Id.* at 631–32, 625 *A.*2d 489. Accordingly, it held that in the event of a re-trial, a pretrial hearing would be required to assess the reliability of the statements and testimony to be presented by those children to determine their admissibility. *Ibid.* The State appeals that determination.

Woven into our consideration of this case is the question of a child's susceptibility to influence through coercive or suggestive questioning. As the Appellate Division noted, a constantly broadening body of scholarly authority exists on the question of children's susceptibility to improper interrogation. *Id.* at 622, 625 *A.*2d 489. The expanse of that literature encompasses a variety of views and conclusions. *Ibid.* Among the varying perspectives, however, the Appellate Division found a consistent and recurrent concern over the capacity of the interviewer and the interview process to distort a child's recollection through unduly slanted interrogation techniques. *Ibid.* The Appellate Division concluded that certain interview practices are sufficiently coercive or suggestive to alter irremediably the perceptions of the child victims. *Id.* at 620–30, 625 *A.*2d 489.

## A.

Like many other scientific and psychological propositions that this Court has addressed in different contexts, *see, State v. J.Q.,* 130 *N.J.* 554, 617 *A.*2d 1196 (1993) (noting the limited use to be made of Child Sexual Abuse Accommodation Syndrome); *In re Guardianship of J.C.,* 129 *N.J.* 1, 608 *A.*2d 1312 (1992) (considering effects of child-parent bonding in adoption cases); *Rubanick v. Witco Chemical Co.* 125 *N.J.* 421, 593 *A.*2d 733 (1991) (addressing scientific theories of causation in toxic torts); *State v. Kelly,* 97 *N.J.* 178, 478 *A.*2d 364 (1984) (determining availability of battered-women's syndrome as self-defense in criminal case); *State v. Hurd,* 86 *N.J.* 525, 432 *A.*2d 86 (1981) (considering practice of hypnosis in determining reliability of hypnotically refreshed testimony), the notion that a child is peculiarly susceptible to undue

influence, while comporting with our intuition and common experience is in fact a hotly debated topic among scholars and practitioners. The recognition of that notion in a judicial proceeding, therefore, requires utmost circumspection.

Additional factors temper our consideration of whether children are susceptible to manipulative interrogation. This Court has been especially vigilant in its insistence that children, as a class, are not to be viewed as inherently suspect witnesses. We have specifically held that age *per se* cannot render a witness incompetent. *State in re R.R.*, 79 *N.J.* 97, 398 *A.*2d 76 (1979). We declined to require or allow, absent a strong showing of abnormality, psychological testing of child-victims of sexual abuse as a predicate to a determination of the credibility of the child-victim as a witness. *State v. R.W.*, 104 *N.J.* 14, 514 *A.*2d 1287 (1986). We have also recognized that under certain circumstances children's accounts of sexual abuse can be highly reliable. *State v. D.R.*, 109 *N.J.* 348, 360, 537 *A.*2d 667 (1988). Nevertheless, our common experience tells us that children generate special concerns because of their vulnerability, immaturity, and impressionability, and our laws have recognized and attempted to accommodate those concerns, particularly in the area of child sexual abuse. *E.g., State v. Bethune,* 121 *N.J.* 137, 143–44, 578 *A.*2d 364 (1990) (recognizing special vulnerability of child-victims in "fresh-complaint" jurisprudence); *D.R., supra,* 109 *N.J.* at 360, 537 *A.*2d 667 (recognizing that child sexual-abuse victims, whose victimizers are often members of family or household, are particularly susceptible to pressure to recant prior to trial); *see also Evid.R.* 803(c)(27)(b) (providing standards for determining trustworthiness of child's out-of-court statement concerning sexual abuse).

The broad question of whether children as a class are more or less susceptible to suggestion than adults is one that we need not definitively answer in order to resolve the central issue in this case. Our inquiry is much more focused. The issue we must determine is whether the interview techniques used by the State in this case were so coercive or suggestive that they had a capacity

to distort substantially the children's recollections of actual events and thus compromise the reliability of the children's statements and testimony based on their recollections.

We begin our analyses by noting, as did the Appellate Division, that the "investigative interview" is a crucial, perhaps determinative, moment in a child-sex-abuse case. 264 *N.J.Super.* at 622–23, 625 *A.*2d 489 (citing Gail S. Goodman and Vicki S. Helgeson, *Child Sexual Assault: Children's Memory and the Law,* 40 *U.Miami L.Rev.* 181, 195 (1985). A decision to prosecute a case of child sexual abuse often hinges on the information elicited in the initial investigatory interviews with alleged victims, carried out by social workers or police investigators. Diana Younts, *Evaluating and Admitting Expert Opinion Testimony In Child Sexual Abuse Prosecutions,* 41 *Duke L.J.* 691 (1991).

That an investigatory interview of a young child can be coercive or suggestive and thus shape the child's responses is generally accepted. If a child's recollection of events has been molded by an interrogation, that influence undermines the reliability of the child's responses as an accurate recollection of actual events.

A variety of factors bear on the kinds of interrogation that can affect the reliability of a child's statements concerning sexual abuse. We note that a fairly wide consensus exists among experts, scholars, and practitioners concerning improper interrogation techniques. They argue that among the factors that can undermine the neutrality of an interview and create undue suggestiveness are a lack of investigatory independence, the pursuit by the interviewer of a preconceived notion of what has happened to the child, the use of leading questions, and a lack of control for outside influences on the child's statements, such as previous conversations with parents or peers. Younts, *supra,* 41 *Duke L.J.* at 729–30, 730–31; *see also,* John E.B. Myers, *The Child Witness: Techniques for Direct Examination, Cross–Examination, and Impeachment,* 18 *Pac.L.J.* 801, 889 (1987) (stating that factors that influence child's suggestibility include: (1) whether interviewer believes in presumption of guilt; (2) whether questions asked are

leading or non-leading; and (3) whether interviewer was trusted authority figure).

The use of incessantly repeated questions also adds a manipulative element to an interview. When a child is asked a question and gives an answer, and the question is immediately asked again, the child's normal reaction is to assume that the first answer was wrong or displeasing to the adult questioner. *See* Debra A. Poole and Lawrence T. White, *Effects of Question Repetition on Eyewitness Testimony of Children and Adults,* 27 *Developmental Psychology,* November (1991) at 975. The insidious effects of repeated questioning are even more pronounced when the questions themselves over time suggest information to the children. Goodman and Helgeson, *supra,* 40 *U.Miami L.Rev.* at 184–187.

The explicit vilification or criticism of the person charged with wrongdoing is another factor that can induce a child to believe abuse has occurred. *Ibid.* Similarly, an interviewer's bias with respect to a suspected person's guilt or innocence can have a marked effect on the accuracy of a child's statements. Goodman and Helgeson, *supra,* 40 *U.Miami L.Rev.* at 195. The transmission of suggestion can also be subtly communicated to children through more obvious factors such as the interviewer's tone of voice, mild threats, praise, cajoling, bribes and rewards, as well as resort to peer pressure.

The Appellate Division recognized the considerable authority supporting the deleterious impact improper interrogation can have on a child's memory. 264 *N.J.Super.* at 629–34, 625 *A.*2d 489. Other courts have recognized that once tainted the distortion of the child's memory is irremediable. *See State v. Wright,* 116 *Idaho* 382, 775 *P.*2d 1224, 1228 (1989) ("Once this tainting of memory has occurred, the problem is irredeemable. That memory is, from then on, as real to the child as any other."). The debilitating impact of improper interrogation has even more pronounced effect among young children. Maryann King and John C. Yuille, *Suggestibility and the Child Witness,* in *Children's Eyewitness Memory,* 29 (Stephen J. Ceci et al. eds., 1987) and

Stephen J. Ceci, *Age Differences in Suggestibility,* in *Children's Eyewitness Memory* 82 (Stephen J. Ceci, et al. ed., 1987).

The critical influence that can be exerted by interview techniques is also supported by the literature that generally addresses the reliability of children's memories. Those studies stress the importance of *proper* interview techniques as a predicate for eliciting accurate and consistent recollection. *See,* Gail S. Goodman, et al., *Optimizing Children's Testimony: Research and Social Policy Issues Concerning Allegations of Child Sexual Abuse* in *Child Abuse, Child Development, and Social Policy* 1992, Dante Cicchetti & Sheree L. Toth (Eds.).

The conclusion that improper interrogations generate a significant risk of corrupting the memories of young children is confirmed by government and law enforcement agencies, which have adopted standards for conducting interviews designed to overcome the dangers stemming from the improper interrogation of young children. The National Center for the Prosecution of Child Abuse, in cooperation with the National District Attorney's Association and the American Prosecutor's Research Institute has adopted protocols to serve as standards for the proper interrogation of suspected child-abuse victims. Those interview guidelines require that an interviewer remain "open, neutral and objective." American Prosecutors Research Institute, National Center for Prosecution of Child Abuse, *Investigation and Prosecution of Child Abuse* at 7 (1987); an interviewer should avoid asking leading questions, *id.* at 8; an interviewer should never threaten a child or try to force a reluctant child to talk, *id.* at 9; and an interviewer should refrain from telling a child what others, especially other children, have reported. *Id.* at 24. The New Jersey Governor's Task Force on Child Abuse and Neglect has also promulgated guidelines. It states that the interviewer should attempt to elicit a child's feelings about the alleged offender, but that the interviewer should not speak negatively about that person. Governor's Task Force on Child Abuse and Neglect, *Child Abuse and Neglect: A Professional's Guide to Identification,*

*Reporting, Investigation and Treatment,* at 31 (1988). Further, multiple interviews with various interviewers should be avoided. *Id.* at 32.

Finally, we can acknowledge judicial recognition of the very same concerns expressed in the academic literature and addressed by the guidelines established by governmental authorities with respect to the improper interrogation of alleged child sex abuse victims. The United States Supreme Court in *Idaho v. Wright,* 497 *U.S.* 805, 110 *S.Ct.* 3139, 111 *L.Ed.*2d 638 (1990), noted with approval the conclusion of the Idaho Supreme Court that the failure to video tape interviews with alleged child victims, the use of blatantly leading questions, and the presence of an interviewer with a preconceived idea of what the child should be disclosing, in addition to children's susceptibility to suggestive questioning, all indicate the potential for the elicitation of unreliable information. *Id.,* at 812–13, 110 *S.Ct.* at 3145, 111 *L.Ed.*2d at 650; *see also State v. Hill,* 121 *N.J.* 150, 168, 578 *A.*2d 370 (1990) (noting potentially coercive effect of having authoritarian figure participate in investigatory interview); *State v. Bethune, supra,* 121 *N.J.* at 145, 578 *A.*2d 364 (expressing concern over leading questions used to elicit complaint of sexual assault of minor); *State v. R.M.,* 245 *N.J.Super.* 504, 516, 586 *A.*2d 290 (App.Div.1991) (noting potential for a partisan questioner to create a coercive environment); *State v. M.Z.,* 241 *N.J.Super.* 444, 451, 575 *A.*2d 82 (Law Div.1990) (ruling child's out-of-court statement inadmissible under *Evid.R.* 803(c)(27) because investigator could not distinguish between what child said and what was suggested to her).

■ We therefore determine that a sufficient consensus exists within the academic, professional, and law enforcement communities, confirmed in varying degrees by courts, to warrant the conclusion that the use of coercive or highly suggestive interrogation techniques can create a significant risk that the interrogation itself will distort the child's recollection of events, thereby undermining the reliability of the statements and subsequent testimony concerning such events.

## B.

■ We next turn to an examination of the interrogations conducted in this case to determine if they were so suggestive or coercive that they created a substantial risk that the statements and testimony thereby elicited lack sufficient reliability to justify their admission at trial.

The interrogations undertaken in the course of this case utilized most, if not all, of the practices that are disfavored or condemned by experts, law enforcement authorities and government agencies.

The initial investigation giving rise to defendant's prosecution was sparked by a child volunteering that his teacher, "Kelly," had taken his temperature rectally, and that she had done so to other children. However, the overwhelming majority of the interviews and interrogations did not arise from the spontaneous recollections that are generally considered to be most reliable. *See Wright, supra,* 497 *U.S.* at 826–27, 110 *S.Ct.* at 3152, 111 *L.Ed.*2d at 659 (implying that spontaneous recall is under normal conditions an accurate indicator of trustworthiness); *D.R., supra,* 109 *N.J.* at 359, 537 *A.*2d 667 ("Moreover, a child victim's spontaneous out-of-court account of an act of sexual abuse may be highly credible because of its content and the surrounding circumstances."). Few, if any, of the children volunteered information that directly implicated defendant. Further, none of the child victims related incidents of actual sexual abuse to their interviewers using "free recall." 264 *N.J.Super.* at 629, 625 *A.*2d 489. Additionally, few of the children provided any tell-tale details of the alleged abuse although they were repeatedly prompted to do so by the investigators. We note further that the investigators were not trained in interviewing young children. The earliest interviews with children were not recorded and in some instances the original notes were destroyed.[1] Many of the interviewers demonstrated ineptness in

---

[1] As a matter of sound interviewing methodology, nearly all experts agree that initial interviews should be videotaped. *See* Goodman and Helgeson, *supra,* 40 *U.Miami L.Rev.,* at 195, 198–99, David C. Raskin & John C. Yuille, *Problems in*

dealing with the challenges presented by pre-schoolers, and displayed their frustration with the children.

Almost all of the interrogations conducted in the course of the investigation revealed an obvious lack of impartiality on the part of the interviewer. One investigator, who conducted the majority of the interviews with the children, stated that his interview techniques had been based on the premise that the "interview process is in essence the beginning of the healing process." He considered it his "professional and ethical responsibility to alleviate whatever anxiety has arisen as a result of what happened to them." A lack of objectivity also was indicated by the interviewer's failure to pursue any alternative hypothesis that might contradict an assumption of defendant's guilt, and a failure to challenge or probe seemingly outlandish statements made by the children.

The record is replete with instances in which children were asked blatantly leading questions that furnished information the children themselves had not mentioned. All but five of the thirty-four children interviewed were asked questions that indicated or strongly suggested that perverse sexual acts had in fact occurred. Seventeen of the children, fully one-half of the thirty-four, were asked questions that involved references to urination, defecation, consumption of human wastes, and oral sexual contacts. Twenty-three of the thirty-four children were asked questions that sug-

---

*Evaluating Interviews of Children in Sexual Abuse Cases* in *Perspectives on Children's Testimony* 184, 195–96 (Stephen J. Ceci et al. eds., 1989) [hereinafter Raskin & Yuille]; Margaret A. Berger, *The Deconstitutionalization of the Confrontation Clause; A proposal for a Prosecutorial Restraint Model*, 76 *Minn.L.Rev.* 557, 608 (1992) (suggesting that the prosecutor should always provide a tape or transcript of an interview to aid in assessing suggestion or coercion). We have recognized generally that the existence of a video or sound recording of a statement elicited through pretrial interrogation is a factor bearing on its reliability. *State v. Gross,* 121 *N.J.* 1, 10, 577 A.2d 806 (1990).

In this case, fully one-half of the earliest interviews at issue here were not audio or video-taped. The record indicates that the DYFS investigator did not begin taping interviews until June 19, 1985. The Court is aware of 39 transcripts of interviews with thirty-four children, or about one-half of those interviewed by DYFS. The rest were apparently unrecorded.

gested the occurrence of nudity. In addition, many of the children, some over the course of nearly two years leading up to trial, were subjected to repeated, almost incessant, interrogation. Some children were re-interviewed at the urgings of their parents.

The record of the investigative interviews discloses the use of mild threats, cajoling, and bribing. Positive reinforcement was given when children made inculpatory statements, whereas negative reinforcement was expressed when children denied being abused or made exculpatory statements.

Throughout the record, the element of "vilification" appears. Fifteen of the thirty-four children were told, at one time or another, that Kelly was in jail because she had done bad things to children; the children were encouraged to keep "Kelly" in jail. For example, they were told that the investigators "needed their help" and that they could be "little detectives." Children were also introduced to the police officer who had arrested defendant and were shown the handcuffs used during her arrest; mock police badges were given to children who cooperated.

In addition, no effort was made to avoid outside information that could influence and affect the recollection of the children. As noted by the Appellate Division, the children were in contact with each other and, more likely than not, exchanged information about the alleged abuses. 264 *N.J.Super.* at 629, 625 *A.*2d 489. Seventeen of the thirty-four children were actually told that other children had told investigators that Kelly had done bad things to children. In sum, the record contains numerous instances of egregious violations of proper interview protocols.

We thus agree with the Appellate Division that the interviews of the children were highly improper and employed coercive and unduly suggestive methods. As a result, a substantial likelihood exists that the children's recollection of past events was both stimulated and materially influenced by that course of questioning. Accordingly, we conclude that a hearing must be held to determine whether those clearly improper interrogations so infected the ability of the children to recall the alleged abusive events that

their pretrial statements and in-court testimony based on that recollection are unreliable and should not be admitted into evidence.

## IV

This Court has a responsibility to ensure that evidence admitted at trial is sufficiently reliable so that it may be of use to the finder of fact who will draw the ultimate conclusions of guilt or innocence. That concern implicates principles of constitutional due process. "[R]eliability [is] the linchpin in determining admissibility" of evidence under a standard of fairness that is required by the Due Process Clause of the Fourteenth Amendment. *Manson v. Brathwaite,* 432 *U.S.* 98, 114, 97 *S.Ct.* 2243, 2253, 53 *L.Ed.*2d 140, 154 (1977). Competent and reliable evidence remains at the foundation of a fair trial, which seeks ultimately to determine the truth about criminal culpability. If crucial inculpatory evidence is alleged to have been derived from unreliable sources due process interests are at risk. *Hurd, supra,* 86 *N.J.* at 547, 432 *A.*2d 86.

### A.

We acknowledge that although reliability assessments with respect to the admissibility of out-of-court statements are commonplace, *e.g., Hill, supra,* 121 *N.J.* at 150, 578 *A.*2d 370; *Bethune, supra,* 121 *N.J.* at 137, 578 *A.*2d 364; *State v. Spruell,* 121 *N.J.* 32, 577 *A.*2d 821 (1990); *State v. A. Gross,* 121 *N.J.* 1, 577 *A.*2d 806 (1990); *D.R., supra,* 109 *N.J.* at 348, 537 *A.*2d 667, assessing reliability as a predicate to the admission of in-court testimony is a somewhat extraordinary step. Nevertheless, it is not unprecedented. *See Manson, supra,* 432 *U.S.* 98, 97 *S.Ct.* 2243, 53 *L.Ed.*2d 140 (authorizing hearing to determine admissibility of in-court identification testimony because of pretrial suggestiveness); *Jackson v. Denno,* 378 *U.S.* 368, 84 *S.Ct.* 1774, 12 *L.Ed.*2d 908 (1964) (same); *State v. Gookins,* 135 *N.J.* 42, 637 *A.*2d 1255 (1994) (requiring pretrial taint hearing to determine admissibility of evidence because of prior falsified police breathalyzer

reports); *Hurd, supra,* 86 *N.J.* 525, 432 *A.*2d 86 (ruling taint hearing necessary to determine admissibility of hypnotically-recalled in-court testimony); *State v. Sugar,* 84 *N.J.* 1, 417 *A.*2d 474 (1980) (requiring taint hearing following police investigatory conduct that led to inadmissible evidence). When faced with extraordinary situations in which police or prosecutorial conduct has thrown the integrity of the judicial process into question, we have not hesitated to use the procedural protection of a pretrial hearing to cleanse a potential prosecution from the corrupting effects of tainted evidence. *Gookins, supra,* 135 *N.J.* at 42, 637 *A.*2d 1255; *Sugar, supra,* 84 *N.J.* at 1, 417 *A.*2d 474; *State v. Peterkin,* 226 *N.J.Super.* 25, 543 *A.*2d 466 (App.Div.), *certif. denied,* 114 *N.J.* 295, 554 *A.*2d 850 (1988).

The determination of the reliability of pretrial statements must take into account all relevant circumstances. In *Gross, supra,* we detailed the range of factors that might bear on the reliability of a pretrial statement. Among those are the person or persons to whom the statement was made; the manner and form of interrogation; physical and mental condition of the declarant, the use of inducements, threats or bribes; and the inherent believability of the statement. 121 *N.J.* at 10, 577 *A.*2d 806.

The inquiry into the reliability of pretrial statements of children in a child-sex-abuse case is similarly comprehensive. The Appellate Division recognized that the assessment of the trustworthiness of a child's statements made in the course of an investigatory interview must touch all relevant circumstances. 264 *N.J.Super.* at 633, 625 *A.*2d 489. In *D.R., supra,* 109 *N.J.* at 348, 537 *A.*2d 667, dealing with the admissibility of statements by child-victims of sexual-abuse under the age of twelve, the Court required a hearing to determine whether a child's statement possesses sufficient indicia of reliability. Among the factors that bear on that determination are: (1) the person to whom the child made the statement; (2) whether the statement was made under conditions likely to elicit truthfulness; (3) whether the child's recitation exhibits unusual or above-age-level familiarity with sex or sexual

functions; (4) post-event and post-recitation distress; (5) any physical evidence of abuse; and (6) any congruity between a defendant's confession or statement. *Id.* at 358, 537 *A.*2d 667; *Evid.R.* 803(c)(27)(b) (providing "that on the basis of the time, content, and the circumstances of the statement there is a probability that the statement is trustworthy"). In *Hill*, the Court noted several factors that should be considered in assessing the reliability of a complaint regarding sexual offenses. They are: (1) the age of the victim, (2) circumstances of the questioning; (3) the victim's relationship with the interrogator; and (4) the type of questions asked, 121 *N.J.* at 168, 578 *A.*2d 370; *see also Idaho v. Wright, supra,* 497 *U.S.* at 820, 110 *S.Ct.* at 3149, 111 *L.Ed.*2d at 655–56 ("We think the 'particular guarantees of trustworthiness' ... must likewise be drawn from the totality of the circumstances that surround the making of the statement.").

In this case we are equally concerned about the reliability of anticipated in-court testimony that may be derived from the out-of-court statements and antecedent interrogations. The considerations that are germane to the assessment of the reliability of in-court testimony parallel those that inform the determination of the reliability of out-of-court statements.

The law governing the admissibility of eye-witness identification testimony provides a helpful perspective in addressing the concerns at issue here. The United States Supreme Court has insisted that a pretrial hearing be held to determine the reliability and admissibility of proffered in-court testimony based on unduly suggestive identification procedures. *Manson, supra,* 432 *U.S.* at 114, 97 *S.Ct.* at 2253, 53 *L.Ed.*2d at 154. Like the investigatory interview in a child sexual-abuse case, a pretrial identification procedure can be a critical moment in the course of a criminal prosecution. *United States v. Wade,* 388 *U.S.* 218, 230, 87 *S.Ct.* 1926, 1932, 18 *L.Ed.*2d 1149, 1158 (1967). The pretrial identification, like the investigatory interview with a child victim, is "peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial." *Ibid.*

Similarly, the effects of an initially suggestive identification, like those of a coercive or suggestive interrogation, are likely to remain corrosive over time; that is, "once the witness has picked out the accused ... he is not likely to go back on his word later." *Id.* 388 *U.S.* at 229, 87 *S.Ct.* at 1933, 18 *L.Ed.*2d at 1159. Further, the effects of suggestive pre-trial identification procedures, as with suggestive or coercive interview practices, are exceedingly difficult to overcome at trial. *Ibid.* Witnesses in both situations are quite likely to be absolutely convinced of the accuracy of their recollection. Thus their credibility, understood as their obvious truth-telling demeanor, is unlikely to betray any inaccuracies or falsehoods in their statements. Younts, *supra*, 41 *Duke L.J.* at 727.

We have also recognized that when an identification is crucial to the prosecution of a criminal case, its reliability, and ultimate admissibility, must be strictly tested through a searching pretrial hearing. *E.g.*, *State v. Clausell*, 121 *N.J.* 298, 326, 580 *A.*2d 221 (1990); *State v. Madison*, 109 *N.J.* 223, 233, 536 *A.*2d 254 (1988); *State v. Ford*, 79 *N.J.* 136, 137, 398 *A.*2d 95 (1979).

Similarly, we have used the protection of a pretrial hearing to assay the reliability of testimony based on the recollection of a witness that may have been altered by suggestive influences. In *Hurd, supra*, 86 *N.J.* at 525, 432 *A.*2d 86, this Court required a pretrial hearing to determine the reliability of testimony based on hypnotically-induced recollection. The identification at issue in *Hurd* was not the product of a conventional pretrial identification proceeding, such as a line-up or photo array, which concerned the Supreme Court in *Wade* and *Manson*. Ms. Hurd, a victim of an attack, recalled the assault but could not recall her assailant. She underwent hypnosis and was able to remember that her husband, Paul, had been her attacker. The Court determined that before a witness could be permitted to testify about matters that he or she was able to recall only through hypnosis, a pretrial hearing must be held to ensure that the hypnotic technique used on the witness was "reasonably reliable." 86 *N.J.* at 543, 432 *A.*2d 86. *See* Elizabeth Loftus and Graham Davies, *Distortions in the Memory*

*of Children* 40 *J.Soc.Issues,* 51, 52–53 (1984) (drawing analogy between amalgamation of fact and fantasy in children's memories and process that occurs in hypnosis).

We are confronted in this case with pretrial events relating not to the identification of an offender but, perhaps more crucially, to the occurrence of the offense itself. Those events—investigatory interviews—are fraught with the elements of untoward suggestiveness and the danger of unreliable evidentiary results. We thus concur in the determination of the Appellate Division, 264 *N.J.Super.* at 631–32, 625 *A.*2d 489, that to ensure defendant's right to a fair trial a pretrial taint hearing is essential to demonstrate the reliability of the resultant evidence.

### B.

■ The pretrial hearing should be conducted pursuant to *Evid.R.* 104. The basic issue to be addressed at such a pretrial hearing is whether the pretrial events, the investigatory interviews and interrogations, were so suggestive that they give rise to a substantial likelihood of irreparably mistaken or false recollection of material facts bearing on defendant's guilt. *See Simmons v. United States,* 390 *U.S.* 377, 384, 88 *S.Ct.* 967, 971, 19 *L.Ed.*2d 1247, 1253 (1968) (ruling that evidence would be excluded if pretrial identification procedures "give rise to a very substantial likelihood of irreparable misidentification"); *State v. Clausell, supra,* 121 *N.J.* at 325, 580 *A.*2d 221.

■ Consonant with the presumption that child victims are to be presumed no more or less reliable than any other class of witnesses, the initial burden to trigger a pretrial taint hearing is on the defendant. *Watkins v. Sowders,* 449 *U.S.* 341, 101 *S.Ct.* 654, 66 *L.Ed.*2d 549 (1981) (holding that no constitutional mandate exists for pretrial *Wade* hearing be held merely because counsel demands it). The defendant must make a showing of "some evidence" that the victim's statements were the product of suggestive or coercive interview techniques. *Id.,* 449 *U.S.* at 350, 101 *S.Ct.* at 659, 66 *L.Ed.*2d at 577 (Brennan, J., dissenting); *State v.*

*Rodriquez*, 264 *N.J.Super.* 261, 269, 624 *A.*2d 605 (App.Div.1993); *State v. Oritz*, 203 *N.J.Super.* 518, 522, 497 *A.*2d 552 (App.Div.), *certif. denied*, 102 *N.J.* 335, 508 *A.*2d 212 (1985).

■ That threshold standard has been met with respect to the investigatory interviews and interrogations that occurred in this case. Without limiting the grounds that could serve to trigger a taint hearing, we note that the kind of practices used here—the absence of spontaneous recall, interviewer bias, repeated leading questions, multiple interviews, incessant questioning, vilification of defendant, ongoing contact with peers and references to their statements, and the use of threats, bribes and cajoling, as well as the failure to videotape or otherwise document the initial interview sessions—constitute more than sufficient evidence to support a finding that the interrogations created a substantial risk that the statements and anticipated testimony are unreliable, and therefore justify a taint hearing.

■ Once defendant establishes that sufficient evidence of unreliability exists, the burden shall shift to the State to prove the reliability of the proffered statements and testimony by clear and convincing evidence. *Hurd, supra*, 86 *N.J.* at 546, 432 *A.*2d 86. Hence, the ultimate determination to be made is whether, despite the presence of some suggestive or coercive interview techniques, when considering the totality of the circumstances surrounding the interviews, the statements or testimony retain a degree of reliability sufficient to outweigh the effects of the improper interview techniques. The State may attempt to demonstrate that the investigatory procedures employed in a case did not have the effect of tainting an individual child's recollection of an event. To make that showing, the State is entitled to call experts to offer testimony with regard to the suggestive capacity of the suspect investigative procedures. The defendant, in countering the State's evidence, may also offer experts on the issue of the suggestiveness of the interrogations. However, the relevance of expert opinion focusing essentially on the propriety of the interrogation should not extend to or encompass the ultimate issue of the credibility of

an individual child as a witness. *Cf. State v. R.W., supra,* 104 *N.J.* at 26, 514 *A.*2d 1287 (holding that absent strong showing of abnormality and substantial need child may not be subjected to psychiatric examination by expert for purpose of determining credibility). The State is also entitled to demonstrate the reliability of the child's statements or testimony by proffering independent indicia of reliability. See *Ford, supra,* 79 *N.J.* at 137, 398 *A.*2d 95 (inquiring, "whether there are sufficient indicia of reliability to outweigh the 'corrupting effect of the suggestive identification itself.'") (quoting *Manson, supra,* 432 *U.S.* at 114, 97 *S.Ct.* at 2253, 53 *L.Ed.*2d at 154). It bears repeating that the focus of the pretrial hearing is on the coercive and suggesting propensity of the investigative questioning of each child and whether that questioning, examined in light of all relevant circumstances, gives rise to the substantial likelihood that the child's recollection of actual events has been irremediably distorted and the statements and the testimony concerning those events are unreliable.

In choosing the burden of proof to be imposed on the State, we are satisfied that the clear-and-convincing-evidence standard serves to safeguard the fairness of a defendant's trial without making legitimate prosecution of child sexual abuse impossible. We have applied the clear and convincing evidence standard to other areas in which the issue of illegal or unreliable evidence was in question. *See, e.g., State v. Sugar,* 100 *N.J.* 214, 239, 495 *A.*2d 90 (1985) (applying "clear and convincing evidence" standard as burden of proof with respect to "inevitable discovery" discovery claim), *Hurd, supra,* 86 *N.J.* at 546, 432 *A.*2d 86 (imposing "clear and convincing" standard on party who proffers hypnotically refreshed testimony).

We have not hesitated to employ the sternest standard of proof in cases involving egregious prosecutorial or police misconduct that implicates judicial integrity and the administration of justice. *Gookins, supra,* 135 *N.J.* at 51, 637 *A.*2d 1255 (relying on the procedure out-lined in *Sugar, supra,* 84 *N.J.* at 25, 417 *A.*2d 474 and imposing beyond a reasonable doubt standard of proof to

counteract egregious constitutional violations); *State v. Gerald,*
113 *N.J.* 40, 118, 549 *A.*2d 792 (1988) (requiring proof beyond a
reasonable doubt that confession was voluntary). Here, however,
although we find the prosecutorial investigations to have been
professionally inept, we cannot conclude that the improper investi-
gatory techniques were the result of conscious bad faith rather
than a lack of training coupled with over-zealousness.

Our decision today should make clear that the investigatory
techniques employed by the prosecution in this case are unaccep-
table and that prudent prosecutors and investigatory agencies will
modify their investigatory practices to avoid those kinds of errors
and to conform to those standards that are now accepted by the
professional and law enforcement communities. Therefore, we
conclude that the need to deter prosecutorial misbehavior will be
adequately fulfilled by the clear and convincing-evidence standard.

Finally, if it is determined by the trial court that a child's
statements or testimony, or some portion thereof, do retain suffi-
cient reliability for admission at trial, then it is for the jury to
determine the probative worth and to assign the weight to be
given to such statements or testimony as part of their assessment
of credibility. Experts may thus be called to aid the jury by
explaining the coercive or suggestive propensities of the interview-
ing techniques employed, but not of course, to offer opinions as to
the issue of a child-witness's credibility, which remains strictly a
matter for the jury. *R.W., supra,* 104 *N.J.* at 26, 514 *A.*2d 1287.
We add the observation that the jury must make that determina-
tion in light of all the surrounding circumstances, and without
reference to the trial court's determination and ruling on admissi-
bility. *See Crane v. Kentucky,* 476 *U.S.* 683, 106 *S.Ct.* 2142, 90
*L.Ed.*2d 636 (1986) (stressing defendant's right to adduce evidence
of circumstances surrounding confession even after Court deter-
mines confession admissible); *State v. Hampton,* 61 *N.J.* 250, 271,
294 *A.*2d 23 (1972) ("admissibility of evidence is for the Court . . .
it is admitted when a proper predicate is laid for it. If the
predicate is disputed but the court is satisfied the evidence should

be received, it is accepted for jury consideration, with an instruction that if they found it credible, then it is admissible for consideration in making up their verdict.").

## C.

In conclusion, we find that the interrogations that occurred in this case were improper and there is a substantial likelihood that the evidence derived from them is unreliable. We therefore hold that in the event the State seeks to re-prosecute this defendant, a pretrial hearing must be held in which the State must prove by clear and convincing evidence that the statements and testimony elicited by the improper interview techniques nonetheless retains a sufficient degree of reliability to warrant admission at trial. Given the egregious prosecutorial abuses evidenced in this record, the challenge that the State faces is formidable. If the statements and proffered testimony of any of the children survive the pretrial hearing, the jury will have to determine the credibility and probative worth of such testimony in light of all the surrounding circumstances.

## V

The judgment of the Appellate Division is affirmed.

Note: Proper names of the investigators have been deleted throughout.

## APPENDIX

This Appendix presents a detailed summary of several interviews.

### 1. *R.F.*

R.F., a three-year-old girl, was interviewed on June 21, 1985, by the Essex County Prosecutor's Office at the Wee Care facility. After several minutes of small talk, R.F. told the investigator that Kelly sometimes sings in school. In response to her inquiry, R.F. indicated that the school owned a piano and that she would show the investigators where it was. At that point, the interview went

off the record and R.F. apparently took the interviewers to the piano room. On their return to the interview room, the following colloquy took place between the investigator and R.F.

The investigator asked, "Do you remember what you were saying to me? You said,—you said Kelly did a lot of bad things to the children."

R.F. responded, "No, she's in jail.... Because she did a lot of bad things.

R.F. was unable to identify any of the "bad things" that Kelly did because, according to R.F., "she only did them to D.A." Then, after several minutes of trying to get R.F. to draw pictures, including one of Kelly, the investigators returned to the alleged abuse. An investigator asked if Kelly or Brenda (another teacher at Wee Care) had ever hurt her. R.F. was clear and unambiguous with her response. R.F. was absolutely certain that they had done nothing to her. The investigators continued to press the questioning. R.F. continually stressed that she had not been hurt or touched. R.F. did say, however, that "they (Kelly and Brenda) did hurt D.A." The interview continued uneventfully, ending with R.F. telling the interviewers that she would like to come back to the school.

A detective from the Prosecutor's office interviewed R.F. again on July 3, 1985. The detective approached his questioning of R.F. somewhat differently than had the previous investigators in that he appeared not to have any warm up period with the child. Prior to engaging in any small talk or even introducing himself to R.F., he asked her "where's Kelly?" In an effort to find out what relationship R.F. had with Kelly the investigator asked the following questions:

Detective: Do you know Kelly?
R.F.: Yes.
Detective: Was Kelly your teacher?
R.F.: Yeah, but she did a lot of bad things to me.
Detective: [W]hat did she do to you that was bad?
R.F.: Yesterday she did something. But I don't know what it is.

Detective: Sure you do, would you like to show me instead of tell me?

R.F. then drew a picture of Kelly, giving her a "mad" face. She indicated to him that she drew a mad face simply because she wanted Kelly to have a mad face. The detective continued the interview asking pointed questions:

Detective: Do you think Kelly can hurt you?

R.F.: No.

Detective: Did Kelly say she can hurt you? Did Kelly ever tell you she can turn into a monster?

R.F.: Yes.

Detective: What did she tell you?

R.F.: She was gonna turn into a monster.

&ast; &ast; &ast; &ast;

Detective: What did Kelly,—was Kelly a good girl or a bad girl?

R.F.: She was a bad girl.

Detective: She was a bad girl, were there any other teachers that were bad?

R.F.: No.

Detective: No, O.K. Kelly was the only bad girl? What did Kelly do that made her a bad girl?

R.F.: She readed [sic].

Detective: She what?

R.F.: She um, she readed [sic] and she came to me and I said no, no, no.

Detective: Did she hurt you?

R.F.: I hurted [sic] her.

Detective: How did you hurt her?

R.F.: Because she, I didn't want to write, and she write and I said no, no, no, no, and I hit her.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

The Detective then questioned R.F. using anatomically correct dolls in an apparent attempt to elicit from R.F. the level of understanding she had concerning certain body parts.

Detective: What are these?

R.F.: Dolls.

Detective: O.K. But what am I pointing to? What's that?

R.F.: An eye, mouth, nose arm.

Detective: What do you call this right here?

R.F.: Vagina.

Detective: What's this right here?

R.F.: Tooshie.

Detective: Tooshie. O.K. What do you call these right up here?

R.F.: I don't know.

Detective: O.K. what do you want to name them? Do you want to name them breasts?

R.F.: Yeah.

Detective: Now we are going to pretend that this is a little boy.

R.F.: Let me see the little boy.

Detective: It has no arms or legs or anything, but we are going to pretend that it's a little boy doll, O.K.? What do you call the little thing between the little boy's legs?

R.F.: Um, feet.

Detective: No, up farther between the legs. Right here.

R.F.: Vagina.

Detective: No, it's a vagina on a little girl, what is it on a little boy?

R.F.: Penis.

Detective: Penis, very good. O.K. Now did you ever see a little boy's penis in the school?

R.F.: Yes, M.Z.'s.

Detective: O.K. Who else was there?

R.F.: That's it, only one.

Detective: Just M.Z. and you? Was Kelly there?

R.F.: She was at jail.

The questioning of R.F. continued; the detective sought to uncover any "bad things" Kelly might have done to R.F. or to anyone else. The following sequence of questions and answers was the first time the use of utensils entered the discussion:

Detective: Now, did Kelly ever do any bad things to you?

R.F.: No.

Detective: Not at all?

R.F.: No.

Detective: Did Kelly ever hurt you?

R.F.: No.

Detective: Do these look familiar?

R.F.: What are them [sic]?

Detective: You tell me what they are?

R.F.: Knife.

Detective: Knife.

R.F.: Do you have anything to eat in here?

> Detective: We're going to pretend that this is a spoon, O.K.?
>
> R.F.: O.K., and this is a knife.
>
> Detective: Did Kelly ever do anything to you with a knife that hurt you? Or bad things to you with a knife?
>
> R.F.: No.
>
> Detective: No. O.K. Do [sic] she ever do bad things or hurt you with a spoon?—No. Did she ever do bad things or hurt you with a knife—I mean fork? OK. What about a wooden spoon? Did you ever see her do bad things or hurt anybody?
>
> R.F.: Um, no.

After concluding the discussion of utensils, and whether Kelly had used utensils on R.F. or any other child, the discussion once again focused on Kelly's alleged mistreatment of R.F. The questioning of this child continued for several more transcript pages. In an attempt to obtain additional information from R.F., the detective told her that he had spoken to several of her friends already and that the information she could provide would help her friends.

### 2. *P.I.*

On June 27, 1985, investigators from DYFS and from the Prosecutor's Office interviewed P.I., a four-and-a-half year old. The interview appeared to be adversarial from the outset. P.I. no longer wanted to participate in any interviews. In an attempt to convince P.I. to cooperate, Investigator (I) told P.I. that he and his colleague had spoken with "lots of other [helpful] kids" since they had last spoken, and that the sooner P.I. cooperated, the sooner they could get out of there. P.I. became annoyed with his persistence telling him that he did not want to talk to him, and stating emphatically, "I hate you." Investigator (I) attempted to calm P.I. and reassured him that he really did not hate the investigator, in fact he knew that P.I. secretly liked him. Over the course of what appears to be several minutes of conversation, P.I. responded to his questions, on at least ten occasions, with "I hate you."

P.I. began to participate in the conversation but continued his refusal to discuss anything concerning Kelly. In an attempt to gain his cooperation, the investigators tried a different approach:

Investigator (I): Come on do you want to help us out? Do you want to help us keep her (Kelly) in jail.
P.I.: No.

\* \* \* \* \* \* \* \*

Investigator (I): Tell me what happened.... I'll make you fall on your butt again.
P.I.: No!

\* \* \* \* \* \* \* \*

Investigator (I): I'll let you hear your voice and let you play with the tape recorder. I need your help again, buddy. Come on.
P.I.: No.

\* \* \* \* \* \* \* \*

Investigator (I): Just tell me—show me what happened with the wooden spoon. Let's go.
P.I.: I forgot.
Investigator (I): No you didn't. I'll tell you what, let's just go to the P.I. doll, we won't waste any time.
Investigator (II): Now listen you have to behave.
Investigator (I): Do you want me to tell him to behave?
Investigator (II): Are you going to be a good boy? Huh? You have to be good. Yes or no?
P.I.: Yes.

\* \* \* \* \* \* \* \*

Investigator (I): If you don't remember words, maybe you can show me.
P.I.: I forgot....
Investigator (I): You remember. You told your mommy about everything, about the music room. And the nap room. And all the stuff. You want to help her stay in jail don't you. So she doesn't bother you anymore and so she doesn't tell you any more scary stories. Did she tell you a story like about this little bird and he built a nest. But did she do that though?
P.I.: Yes.

After P.I. began to cooperate the interviewers' questions turned to more specific acts allegedly committed by Kelly. P.I. told Investigator (I) that he and another Wee Care child put their penises into Kelly at the same time. They were able to accomplish that by chopping off their penises. Further, some of the children had to urinate in Kelly's mouth, and she would do the same to them. P.I. also discussed the utensils used by Kelly on the children.

Investigator (I): Did she put the fork in your butt?  Yes or no?

P.I.: I don't know, I forgot.

Investigator (I): You forgot?  O.K.  Did she do anything else to your bottom?

P.I.: That's all that she did.

Investigator (I): What was it that she did to you?

P.I.: I hate you.  I hate you.

Investigator (I): Oh, come on, if you just answer that you can go.

P.I.: I hate you.

Investigator (I): No you don't.

P.I.: Yes I do.

Investigator (I): You love me I can tell.  Is that all that she did to you, what did she do to your hiney?

Investigator (II): What did she do to your hiney?  Then you can go.

P.I.: I forgot.

Investigator (II): Tell me what Kelly did to your hiney and then you can go.  If you tell me what she did to your hiney we'll let you go.

P.I.: No.

Investigator (I): Please.

P.I.: O.K.  O.K.  O.K.

Investigator (I): Tell me now.

P.I.: O.K.

Investigator (I): What did Kelly do to your hiney?

P.I.: I'll try to remember.

Investigator (I): What did she put in your hiney?

P.I.: The fork.

Investigator (I): Did that hurt a lot?  Did you bleed?

P.I.: Nope.

## 3.  *B.M.*

On June 26, 1988, Investigator (I) interviewed B.M., a six year-old boy.  The interview began in typical fashion with Investigator (I) asking B.M. to draw pictures of himself, his mother, his father and Kelly.  After B.M. drew several pictures, Investigator (I) began asking B.M. about Kelly.

Investigator (I): I talked to all of [the kids in your class] and they were telling me how they didn't like the stuff Kelly was doing.  Anyway I like talking to you older guys better because you're better to talk to, more like grownups than the little kids in the nursery school.  So I'm asking you a favor—

B.M.: Why because they talked about Kelly because she did something bad to them?

Investigator (I): Uh, huh.

B.M.: What?

Investigator (I): She did bad stuff to them.

B.M.: Not me.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Investigator (I): She was hurting some kids in not some nice ways. So I'm wondering if you saw anything. You can help me to find out who some of the hurt kids are so that I can make it all better again. Because they must be pretty upset and pretty mad.

B.M.: What did she do?

Investigator (I): Well, I don't want to tell you exactly what she did because you may know something that I don't know yet, and that can really help. . . . These are funny dolls. A little different from those you have seen before.

B.M.: I want to leave.

Investigator (I): Why.

B.M.: Because I don't like—

Investigator (I): Like what? You don't like being here: Well you'll be out of here in a couple of minutes. And you never have to come back if you don't want to. Anyway these are—what's different about these dolls, this one's a boy.

B.M.: Yeah.

Investigator (I): Because he's got a what? What do you call this?

B.M.: I don't know.

Investigator (I): You know. Is it a peepee [sic] or a penis? What's the word you use?

B.M.: A wee-wee.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Investigator (I) then went to a female doll and asked B.M. questions about its anatomy.

Investigator (I): What are these things. What do we all have here? Breasts or boobies, what do you want to call them?

B.M.: You're teaching me.

Investigator (I): I'm not teaching you, I am asking you. Come on. Don't go throwing stuff around like that. It's not very nice.

B.M.: Stop teaching me this stuff.

Investigator (I): You got [sic] to learn somehow. The little three-year-old kids knew what everything was. And you don't. Anyway, what I did is [sic] show the kids dolls like this and then I pull out this stuff. A wooden spoon, a fork, a knife and a teaspoon, a metal spoon. Your daddy was telling that you would hit mommy.

Mommy would hit you on the butt sometimes when you deserved it, right? But aside from that did you ever see Kelly hurt anybody with this?

B.M.: Yeah.

Investigator (I): How do you think she might hurt somebody with this? For example, it would hurt, how do you think she might hurt a little boy with this, this wooden spoon.

B.M.: She did that. [Apparently demonstrating with the doll and the spoon that Kelly would smack the boys on the bottom.]

Investigator (I) introduced the possible use of other utensils into the conversation, identifying each to B.M. B.M. steadfastly refused to say that he was hurt with any of the utensils by Kelly. At one point however, he seemed to implicate his mother as the one responsible for the bruises on his back. Investigator (I) continued to question B.M. about how Kelly used the various utensils on him and his friends. At one point he exhibited frustration at not receiving the cooperation or the answers for which he was looking.

Investigator (I): I want to ask you something.

B.M.: No.

Investigator (I): Don't be a baby. You're acting like a nursery school kid. Come here. Come here a second. B.M., come here. We're not finished yet. Sit down.

B.M.: No.

Investigator (I): Come here. Seriously, we are going to need your help on this.

B.M.: No I'm not.

Investigator (I): How do you think she would hurt boys and girls, with a fork? A fork in the face? Sticking on the legs? The arms or on the neck? Does that hurt?

B.M.: [Inaudible reply.]

At that point in the questioning B.M. told Investigator (I) that he wanted to leave. Investigator (I), in an effort to put B.M. at ease, changed the tenor of the conversation and began to reassure B.M. that he was safe from Kelly.

Investigator (I): I know it must not be very easy to remember this and to talk about it. It's painful and embarrassing. I also know that she scared a lot of kids and telling them things that weren't true. About monsters and about how she can fly. I heard all those stories from your friends. Did you know Kelly is in jail?

B.M.: Yeah.

Investigator (I): If you help me out, when we finish here in a couple of minutes I will introduce you to the man who put her in jail.

B.M.: I thought you put her in jail.

Investigator (I): I helped to get her there. By talking to all the kids and telling me the truth about what happened. The more kids we get to tell us what happened the longer she can stay in jail. You see?

You said you were real upset when she was hurting your friend or damaging your friends, we do not want her damaging anymore kids, right? So when we finish today, I will introduce you to the man who put her in jail. And, if you want, if you help me out I can have Sgt. Noonan of the local police department show you what a jail cell looks like so that you can see it, how tough it is for her, she cannot break out of jail, like she was telling everybody. I think she was telling everybody she had superpowers, that she could see through walls and stuff like that. She doesn't have anything like that. She's a regular woman. A regular person.

B.M.: Is she really like that? Super powers?

Investigator (I): No. I think you know that she doesn't have super powers. You know what it is, Kelly was sick when she was hurting kids. It's o.k. to like her, she was a nice lady until she got sick. And then after she got sick is when she started hurting kids. . . .

Investigator (I): Did she try to bother you and you didn't let her?

B.M.: No.

Investigator (I): It would be o.k. to tell me the truth if she did try to bother you just so that you can show me how she might just try to hurt these other kids. 'Cause the more we know the longer she will stay in jail. You understand? And I think you would like to know that she doesn't have any secret powers, she can't fly, she can't see through walls, she can't hurt anybody with her vision. . . . What are some of the other stories that she used to scare the kids? That they wouldn't tell anybody. Did she tell them she would hurt their parents or something  Do you know if she said that?

B.M.: Yeah.

Investigator (I): You know that's not true. . . . The police put her in jail. Because she was hurting you, you know. That's why I really need your help, especially you older kids, you six-year-olds and kindergartners, because you can talk better than the little kids, and you can show things a little clearer on the dolls. And if you help us out we can take you on a little tour of the jail. And you will be helping to keep her in jail longer so that she doesn't hurt anybody else. Not to mention that you'll feel a lot better once you start—

B.M.: It's scaring me.

      *       *       *       *       *       *       *       *

Investigator (I): That's o.k. . . . Believe me she is not going to be coming out of jail. She's not going to be hurting you guys anymore. That's why I'm really proud of you, and E.N. and L.J. Which one got hurt the worst?

B.M.: None of them.

Investigator (I): That's not what they told me.

B.M.: I never saw anybody get hurt.

Investigator (I): You never saw anybody get hurt? Did they ever tell you that they got hurt? See, the reason I think that you might have gotten hurt or seen them ... is that you started to show me on the dolls just exactly what happened. And unless you saw it happen you wouldn't really know, would you?

B.M.: I didn't get hurt.

Investigator (I): No maybe you didn't, maybe you fought her off. Maybe you really didn't hurt then. Maybe you saw your other friends getting hurt and you didn't like it very much. You know.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

B.M.: What did Kelly do?

Investigator (I): Oh I think you know. N.J. told me, and G.G. told me that she hurt them in the gym downstairs. And E.N. told me what he saw.

B.M.: What did he see?

Investigator (I): I don't want to tell you what they told me because I want to know if everybody is telling me the truth. If what you tell me goes along with what they said, then I know they were all telling the truth. You know what I mean, jellybean.

B.M.: I want to leave.—Now!

Investigator (I): Did you ever go in the music room? The room with the big black piano?

B.M.: No.

Investigator (I): Did you ever see Kelly play Jingle Bells on the piano?

B.M.: No.

Investigator (I): How did she look when she was sitting at the piano?

B.M.: I never saw her play the piano.

Investigator (I): Did she look like this when she was sitting at the piano?

B.M.: No.

Investigator (I): Did you ever see Kelly locking any of the kids in the bathroom or closet?

B.M.: No.

Investigator (I): If you did see her hurt any kids would you tell me?

B.M.: No.

B.M. steadfastly refused to implicate Kelly in any way. The interview continued for a few more minutes, ending with Investigator (I)'s final attempts to gain "cooperation" from B.M.

B.M.: I want to leave now.

Investigator (I): I'd hate having to tell your friends that you didn't want to help them.

B.M.: I do.

Investigator (I): I'll have to tell them that you didn't want to though.

The interview ended without any further comment from B.M.

*For affirmance*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal*—none.